[No. 14684. Department Two. March 13, 1919.]

GEORGE BEDTELYON, *Respondent,* v. OTIS ORCHARDS COMPANY, *Appellant.*[1]

VENDOR AND PURCHASER (53)—RESCISSION BY VENDOR. There was notice of cancellation of a contract for the purchase of land for default in payments, where after several extensions demand was made in a letter stating that the vendor "cannot allow this matter to run over thirty days from date of this letter," the rescission taking place at the end of such time.

SAME (54)—CANCELLATION OF CONTRACT—NOTICE OF ASSIGNMENT. The fact that an assignee of a land contract had trimmed and cultivated the orchard during the summer months, not living on the land, is not notice to the vendor of an assignment of the contract, requiring notice of cancellation to the assignee, where different persons had theretofore performed the same service for the purchaser.

Appeal from a judgment of the superior court for Spokane county, Oswald, J., entered November 5, 1917, upon the verdict of a jury rendered in favor of the

[1]Reported in 179 Pac. 96.

plaintiff, in an action for damages for rescission of a land contract, after a trial on the merits. Reversed.

*Cannon & Ferris,* for appellant.

*S. Edelstein* and *Graves, Kizer & Graves,* for respondent.

MOUNT, J.—This action was brought to recover damages for alleged rescission of a contract for the sale of real estate. The case was tried to the court and a jury. At the close of the evidence, the defendant moved the court for a directed verdict; this motion was denied; the case was submitted to the jury; and a verdict was returned in favor of the plaintiff for $2,399.78. The defendant has appealed from a judgment upon the verdict.

A large number of errors are assigned, but it will be necessary to consider only whether the court should have directed a verdict in favor of the appellant.

The facts are as follows: On January 1, 1910, the Spokane Canal Company was the owner of a tract of land which had been divided into ten-acre tracts and claimed to have been brought under irrigation. On that date, it entered into a contract with one Oscar Schwidetzky to sell to him one of these ten-acre tracts for the price of $3,493, of which sum $493 was paid in cash and the balance was to be paid in six annual $500 installments, beginning February 1, 1911. These deferred payments were evidenced by promissory notes of Mr. Schwidetzky bearing interest at the rate of seven per cent per annum. The contract, in so far as it affects the question now under consideration, is as follows:

"It is expressly agreed and understood that time is the essence of this contract, and is as much a consideration therefor as the payment of the sums men-

tioned to be paid by said second party and that a default in the payments herein mentioned, or in the performance of any other agreements herein contained, shall, at the option of the first party (Spokane Canal Company), and upon its giving thirty (30) days' notice, work a forfeiture of this contract; and if any action shall be brought for the forfeiture of this contract, there shall be included all costs and such sum as the court may adjudge reasonable as attorney's fees.

"Notice of cancellation of this contract for any breach thereof, as hereinbefore provided for, shall be addressed to the purchaser, directed at the post-office named below, and deposited in a United States Post Office, postage prepaid, which shall constitute a good and sufficient notice and service thereof.

"No assignment or transfer of any interest in this contract or the said lands and water rights less than the whole will be recognized by the said party of the first part under any circumstances, or in any event whatever; and no assignment shall be binding upon the said party of the first part unless approved by its manager or duly authorized agent."

The post-office address of the purchaser, Mr. Schwidetzky, was given in the contract as No. 19 Murray St., New York City, N. Y. On February 11, 1911, Mr. Schwidetzky paid to the Spokane Canal Company $535, being the first installment note with interest; and thereafter, in April of the same year, he paid $15 to that company for maintenance fee of the water system. In the meantime, the Spokane Canal Company had been placed in the hands of a receiver, and afterwards the receiver, by order of the court, sold the property of the canal company to one A. H. Kroll, and this sale was afterwards confirmed. Thereafter, on August 14, 1911, Mr. Kroll and wife conveyed all the property purchased at the receiver's sale to the Otis Orchards Company, the appellant in this case. The property conveyed by Mr. Kroll to the appellant

included, by specific description, the tract in controversy, and covenanted that the lands were clear of any incumbrance except as to the outstanding contracts of sale, which contracts the Otis Orchards Company assumed and agreed to carry out.

Thereafter, on February 19, 1912, Mr. Schwidetzky paid to the Otis Orchards Company $570, being the payment due on the first of that month; and on February 7, 1913, he paid to the Otis Orchards Company $605.19, being the payment due on February 1st of that year, and interest; and on March 30, 1912, he paid $15 maintenance fee to the Otis Orchards Company. No other payments have ever been made on account of the contract. Shortly after the purchase of the ten-acre tract by Mr. Schwidetzky in 1910, he employed the respondent, Mr. Bedtelyon, to plant the tract to orchard. The tract was so planted at a cost of about $25 per acre. Thereafter, for the years 1911, 1912, and 1913, an agent of Mr. Schwidetzky cared for the young orchard. In the year 1914, after the note due in that year was payable, Mr. Schwidetzky addressed a letter to the appellant saying, in substance, that he was unable to make the payment at that time and asking for an extension of three months. This letter was written on February 28, 1914. In the meantime, the note had been sent by the appellant to a bank in New York City to be collected. Mr. Schwidetzky then on March 3d wrote a letter to the appellant stating that he could not pay the note at that time, but desired an extension of three months, and at the end of that time the note would be paid. In reply to this letter, the Otis Orchards Company wrote a letter stating:

"In regard to the note due this company, will say that we need money very badly, but if your circumstances are such that you cannot make payment at this time, we will have to wait. However, we trust you will

use your very best endeavors to clean this note up as soon as possible."

About this time, the respondent, Mr. Bedtelyon, made an offer to Mr. Schwidetzky to purchase his interest in the contract, and on March 14, 1914, Mr. Schwidetzky wrote a letter to Mr. Bedtelyon stating as follows:

"I received your letter of the 6th inst. and thank you very much for the offer which you make me. I expect to be in Otis Orchards some time in June and don't you think that we should postpone our arrangement until I can see you personally. I am in favor of making the change. You can consider the whole thing arranged and go ahead and work my orchard. If by one chance or other we should be unable to come to terms, I will pay you what you spent on the orchard but I am convinced that you and I will come to terms."

Thereupon Mr. Bedtelyon proceeded to prune and cultivate the orchard for the year 1914. On April 21, 1914, the Otis Orchards Company wrote a letter to Mr. Schwidetzky as follows:

"We have heard the rumor at Otis that you have transferred your contract on land there to Mr. Geo. Bedtelyon. Will you kindly inform us if this is so? The company will recognize no assignment unless all past due payments are made at time of assignment. Awaiting your reply, we are, Yours very truly, . . ."

On May 15, 1914, Mr. Schwidetzky wrote a letter to the Otis Orchards Company, stating as follows:

"I received your favor of April 21 and wish to apologize for the delay in answering same. Will you be kind enough to let me know exactly what I owe your company in interest not paid? It is my intention, if possible, to either sell or transfer my orchard and I trust that you will help me to do so."

On May 20th, in answer to this letter, the Otis Orchards Company replied, referring to the contract with

Mr. Schwidetzky as No. 221, stating the total amount due thereon to be $1,955.01, and also stating:

"Regarding the Bedtelyon deal will say that we are not averse to Mr. Bedtelyon or any one else buying this place, provided they pay the company what is due at the time they make the purchase, otherwise we cannot consent to an approval of an assignment of contract."

On June 4, 1914, Mr. Schwidetzky wrote a letter to Mr. Bedtelyon, stating:

"Today, I have forwarded to our mutual friend Ritter, the contract and legal papers necessary for transferring my orchard to you. Please be kind enough to call upon Mr. Ritter and get the papers and give him in return the ten shares in your company."

On July 17, 1914, the Otis Orchards Company wrote to Mr. Schwidetzky as follows:

"Regarding the condition of your contract No. 221 with this company, wish to state that something must be done as regards the past due payment in the near future or the company will cancel the contract. It has been rumored here that Bedtelyon is now the owner of your equity. This cannot be so as no assignment of one of our contracts can be made unless such assignment is approved by the company and we have certainly not approved any assignment to Bedtelyon or anyone else.

"We wish an answer from you as to the exact status of this contract and what you propose to do in the matter."

On July 24th Mr. Schwidetzky answered this letter as follows:

"I received your letter of July 17th, and expect to be in Spokane the middle of September. Please do not take any action until I am out there as no doubt we will come to an understanding pleasing both you and me."

On November 20th the Otis Orchards Company wrote to Mr. Schwidetzky as follows:

"In answer to a request of this company early in the summer that you take care of your past due payments under your contract No. 221, you replied that you would be here sometime in September and would endeavor to straighten the matter up. We have not seen you here or heard from you by letter since and would advise that you surrender your contract to us and we will return your notes unless you are in position to take care of your past due payments without any further delay.

"We cannot allow this matter to run over thirty days from date of this letter."

On December 1, 1914, Mr. Schwidetzky answered that letter as follows:

"I received your letter of November 20th and I will surely write you before Tuesday, the 8th, and will tell you exactly what I can do. I thank you very much for the patience you have shown so far."

On December 19th, Mr. Schwidetzky again wrote the Otis Orchards Company, stating as follows:

"I beg to refer to my letter of December 1st, in which I promised to write you definitely about the orchard and feel sincerely sorry that so far some arrangements which I have made regarding my orchard have not turned out as expected. In January, shortly after the New Year, I will, however, know exactly where I stand and will write you in detail. Please have patience."

On December 31, 1914, Mr. Schwidetzky wrote a letter to Mr. Ritter as follows:

"Regarding my orchard, I have decided to accept George Bedtelyon's shares of the Snake River Orchard. I really feel this is the best I can do and I wish, therefore, that you would transfer to George Bedtelyon my shares in exchange for his. By this transfer, all present and future obligations which are

connected with my orchard in Otis are taken over and taken care of by Geo. Bedtelyon."

On the same day he wrote a letter to Mr. Bedtelyon stating as follows:

"I received your letters of the 11th of October and the 19th of December and have written today, to Mr. Ritter as per enclosed copy. All obligations which the Otis Orchards Co. or any other company which has connection with the contract No. 221 is transferred to you and I am relieved from any present or future obligation and payments."

Mr. Bedtelyon, upon the trial of this case, testified as follows concerning the receipt of the letter of March 14th from Mr. Schwidetzky, hereinbefore quoted:

"Soon after receiving that letter—I have no way of fixing the exact date—I went to see Mr. Kroll, president of the Otis Orchards Co. He was in his office at that time, here in town. . . . I went to see Mr. Kroll to see what condition the payments were in and to see if there was going to be some improvements made in our water system. I asked him first how much was due on that contract. He looked it up, and how much back interest, and told me; then I told him I contemplated buying it, and he said it was all right if I could make the payments, and I told him I could, but before I invested I wanted to know what he was going to do about the water system; I didn't care to invest until they had made a good water system. I had money enough to invest in that kind of land. He said: 'George, we are going to improve that system, we are going to dredge the canal and put wells, if necessary, and perhaps electric lights and domestic water.' I said: 'Well, that sounds good,' and as near as I recall our conversation, I said: 'If you can make good, I can.' He said: 'You need not worry but what I can.' Then I said: 'If you can make good I can make the payments.' He said: 'Well you go ahead and take good care of it and if we fall down I don't expect you to make the payments; we will do everything we can to help you.' He said he was perfectly

satisfied and willing to help me for the simple reason that Mr. Schwidetzky had gone broke, and various financial reverses, and lost his wife, and was going to lose it, and I could make it. . . . Then I immediately went to work upon the orchard. I went to pruning, plowing and cultivating, taking good care of it like I would my own tract, all summer. I done the same thing for two years.''

Mr. Bedtelyon testified that at another time he went to see the company and that:

''I asked them if they would not give me a deed to the five acres and they take the five acres, which would make $100 more an acre to them for the five acres that we kept, and the contract called for, and the money paid and the deed paid more than what it would amount to $350 an acre, and that I would return them also—they would have this five acres back with an improved orchard, for a deed to the other five acres and call it square. Mr. Axtell (secretary of the company) spoke up and said: 'What is the use when we can just as well have all of it?' I said: 'All right, if that is your policy get it.' ''

He also testified that he afterwards had a talk with Mr. Kroll, the president of the company; that Mr. Kroll would not promise him anything; that there were no further conversations between them. The respondent makes the statement that the only material disputed question is whether a duly authorized agent of the company consented to the assignment of Mr. Schwidetzky to Mr. Bedtelyon as provided in the contract; and it is claimed that it was therefore a question for the jury on the statements of Mr. Bedtelyon whether the company had authorized the assignment.

We think there is a further question in the case, and that is, whether Mr. Bedtelyon, or any one else, ever notified appellant that there had been an actual assignment of the contract. The correspondence be-

tween the appellant and Mr. Schwidetzky, in whose name the contract stood, shows very clearly that the appellant had refused to consent to an assignment of the contract until all past due payments were made. We find nothing in the record of any actual notice to the appellant that there had ever been an assignment of the contract from Mr. Schwidetzky to the respondent. It is true the respondent testified that he was contemplating taking over the contract from Mr. Schwidetzky; that he went to the office of the appellant and inquired how much was due upon the contract and was then informed of the amount that was due. He then, in substance, told the company that he was contemplating purchasing the contract; and they told him that if he could make the payments it would be satisfactory to them. It is not claimed anywhere in the evidence that, after the assignment of the contract had been delivered to him, he in any manner, either constructively or actually, notified the appellant that there had been an actual assignment of the contract. So far as appears from the evidence, the appellant never had notice that the contract had been assigned by Mr. Schwidetzky to Mr. Bedtelyon or any one else. The appellant made several inquiries of Mr. Schwidetzky whether he had made an assignment of his contract and received no answer on that question. It is clear, therefore, that appellant had a right to regard Mr. Schwidetzky as the holder of the contract. Mr. Schwidetzky admittedly was far in arrears in his payments. The contract was subject to cancellation by reason of past due payments. The contract, as we have hereinbefore quoted, provided that notice of cancellation should be addressed to the purchaser directed at the post-office address named in the contract. This notice was given on November 20th as provided for in

the contract. At the time that notice was given, the assignment had not been made from Mr. Schwidetzky to Mr. Bedtelyon. The assignment, according to the testimony of the respondent and according to the letters hereinbefore quoted, was not finally made until December 31st, more than a month after that notice. At that time the contract had been rescinded between the appellant and Mr. Schwidetzky, who then held the contract. In vol. 2 of Black on Rescission and Cancellation, at § 572, the rule is stated as follows:

"In the absence of statutory regulation, the parties to a contract may stipulate for the character, time, and other conditions of the notice of cancellation which shall be required to terminate it, and, for example, a provision in a land contract that notice of cancellation shall be directed to the vendee at a named post office, 'which shall constitute a good and sufficient notice and service thereof,' is valid."

And in *True v. Northern Pac. R. Co.,* 126 Minn. 72, 147 N. W. 948, the court said:

"In the absence of a statute prescribing a different method of service, the method provided by the contract is sufficient. Plaintiff saw fit to stipulate in his contracts that the mailing of a notice of cancellation directed to him at Spokane, Washington, should be sufficient service of such notice, and this provision of his contracts is binding upon him. *Kerns v. McKean,* 65 Cal. 411, 416, 4 Pac. 404; *Schwab v. Baremore,* 95 Minn. 295, 104 N. W. 10. The notice of termination of these contracts was sufficient under the laws of Washington."

In vol. 2 of Black on Rescission and Cancellation, it is said at § 573:

"And it is to be observed that a notice for this purpose is none the less effective because it is expressed in polite terms or in language which falls short of being imperative, provided the intention is made clear.

Thus, a sufficient notice of cancellation may be given where one party advises the other that 'we wish to cancel our contract,' or 'we are obliged to cancel,' or 'we ask to rescind and place both parties just where they were before the trade.' And again, unless it is otherwise provided in the contract itself or in some statute regulating the subject, the disaffirmance or rescission of a contract may be effected by a notice given orally and without any writing or ceremonious denunciation of the alleged grounds for its cancellation.''

We are satisfied that, under the letter of November 20th, the rescission of the contract took place at the end of thirty days.

It is argued by the respondent that he went into possession of the land in the year 1914 and continued in possession until 1915, and that it was the duty of the appellant to take notice of his right to possession. It is not claimed that there was any actual possession except the mere fact that the respondent had trimmed the trees and cultivated the orchard during the summer months. There were no buildings on the premises. The respondent lived in the vicinity, not upon the property. Different persons, for different years, had taken care of the orchard for Mr. Schwidetzky. The appellant assumed, of course, that the same method was being pursued, and it had a right to so assume because it had no notice of any assignment of the contract with Mr. Schwidetzky. We think the record clearly establishes the fact that there was no assignment of the contract from Mr. Schwidetzky to the respondent until after the cancellation by notice on November 20, 1914; but, even if there was an actual assignment, the appellant had no notice thereof. It was therefore the duty of the court to have directed a verdict at the close of the evidence.

The judgment appealed from is therefore reversed and the action dismissed.

PARKER, MAIN, FULLERTON, and HOLCOMB, JJ., concur.